J-A20027-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| BRIAN JOSEPH WYDA | : | |
| | : | |
| Appellant | : | No. 43 MDA 2019 |

Appeal from the Judgment of Sentence Entered December 5, 2018
In the Court of Common Pleas of Lackawanna County Criminal Division at
No(s):  CP-35-CR-0001038-2017

BEFORE:  GANTMAN, P.J.E., McLAUGHLIN, J., and FORD ELLIOTT, P.J.E.

MEMORANDUM BY McLAUGHLIN, J.:            **FILED DECEMBER 06, 2019**

Brian Joseph Wyda appeals from the judgment of sentence entered following his jury-trial conviction for two counts of aggravated assault, and one count each of simple assault, recklessly endangering another person, resisting arrest, and disorderly conduct.[1] The court also found Wyda guilty of the summary offense of harassment.[2] Wyda challenges the sufficiency of the evidence to support the aggravated assault, simple assault, and REAP convictions, arguing the Commonwealth failed to prove he had the requisite mental state to commit the crimes. We affirm.

The convictions arose from an incident that occurred in April 2017. Officer Michael Albert of the Scranton Police Department responded to a report

---

[1] 18 Pa.C.S.A. §§ 2702(a)(2), 2702(a)(3), 2701(a), 2705, 5104, and 5503(a)(1), respectively.

[2] 18 Pa.C.S.A. § 2709(a)(1).

of a male laying on the side of the road, with a possible medical condition. N.T, 9/5/18, at 36. Officer Albert later learned the male was Wyda. *Id.* at 51. During the encounter, Wyda punched Officer Albert, causing severe pain, and herniation of two discs.

The following testimony was presented at a September 2018 trial. Paul Kearns testified that during the evening of April 21, 2017, he and his wife were watching television when they heard a pounding noise and screaming. N.T., 9/4/18, at 25. He then observed Wyda,[3] pounding on a trunk of a car and screaming. *Id.* His wife called 911. *Id.* Kearns went onto his front porch, where he saw Wyda fall to the ground. *Id.* He testified that when the emergency medical technicians ("EMTs") arrived, they tried to put Wyda on a stretcher, and Wyda woke up. *Id.* Kearns testified that Wyda started to get "combative," and a police officer attempted to help. He stated Wyda "woke up, started screaming and yelling again, [and] moved toward the cop." *Id.* at 26. The police officer told him to back off, and tased Wyda. *Id.* Kearns testified that the police officer and Wyda ended up on the ground and "then two or three more cop cars came, and the[ officers] go to the man and put him on the side." *Id.*

Christina Sullivan testified that she was driving home on April 21, 2017, when she saw Wyda laying on the side of the road. *Id.* at 37. He was flailing

---

[3] Neither Kearns nor another eyewitness Christina Sullivan identified Wyda at trial as the man they observed. Because Wyda's identity is not at issue, and for ease of discussion, we will refer to the person observed by Kearns and Sullivan as Wyda.

his body and "hitting himself off of the pavement of the road." *Id.* Sullivan pulled over and called 911. *Id.* Sullivan said that by the time she pulled over, Wyda was lifeless. *Id.* at 39. She testified that Wyda woke up after he was placed on the stretcher, and asked what was going on. *Id.* at 49. The EMTs and police officer attempted to reassure Wyda, but he got louder, tried to get up from the stretcher, and proceeded to go after the police officer. *Id.* at 41. The police officer warned Wyda several times that he would be tased if he did not calm down. *Id.* at 42. The officer tased Wyda, and he fell to the ground, but got back up and again went after the officer. *Id.* Sullivan remembers that the officer and EMTs were trying to subdue Wyda, who was very combative. *Id.* at 44. She observed that the officer was injured. *Id.* at 45.

A paramedic, Jeffrey Kovalchik, also testified at trial. On the night of the incident, he was dispatched to assist with a disorderly male on the side of the road. *Id.* at 54. When he arrived he observed a male, later identified to be Wyda, lying on the side of the road. *Id.* at 56. When he and his partner approached, Wyda's eyes were open, and he was mumbling. *Id.* at 57. Kovalchik stated that he was not sure if Wyda "knew [they] were there." *Id.* at 70. They picked Wyda up and placed him on a stretcher. *Id.* at 59. Wyda's eyes were open and fixated on Officer Albert, who arrived at the scene with the EMTs. Wyda started to yell, "I didn't do anything. I didn't do anything. I didn't do anything." *Id.* Wyda jumped off the stretcher, and focused on Officer Albert. *Id.* at 60. Kovalchik testified that Officer Albert was telling Wyda to relax and that they just wanted to check him out. *Id.* at 61. Wyda kept going

toward Officer Albert in a "threatening manner." *Id.* Kovalchik testified that he went to the ambulance to retrieve something to subdue Wyda, and he heard Officer Albert deploy a taser. *Id.* at 59, 61. He stated that the taser had gone through Wyda's coat, which he wiggled out from. Wyda then retrieved the mattress from the stretcher and threw it at Officer Albert, and charged at Officer Albert. *Id.* at 62. Wyda and Officer Albert were struggling on the ground, and Kovalchik and his partner went to help. *Id.* at 63. During the struggle, Wyda punched Officer Albert, and the contact hyperextended Officer Albert's neck. *Id.* at 64. Back-up officers then arrived and placed Wyda into custody. *Id.* at 65-66. Kovalchik testified that from the time they placed Wyda on the stretcher to the time back-up officers arrived, was approximately five to six minutes. *Id.* at 80.

Kovalchik's partner, Jason Evankavitch, provided testimony similar to Kovalchik's testimony. He testified that Wyda was not conscious when initially placed on the stretcher, but woke up as they were buckling him into the stretcher. *Id.* at 90. However, unlike Kovalchik, he testified that he was not able to understand what Wyda was saying when he was yelling at Officer Albert. *Id.* at 91-92.

Officer Albert testified that when he and the EMTs arrived, Wyda was unresponsive, had a "blank stare," and was "focused" on Officer Albert. N.T, 9/5/18, at 37-38. Officer Albert told him he was not in trouble and was not under arrest, and that he was there to help. *Id.* The EMTs placed Wyda on a stretcher, after which he started swinging his arms and kicking at the

stretcher. *Id.* Officer Albert testified that Wyda was mumbling and that he could not understand what Wyda was saying. *Id.* Wyda jumped off the stretcher and walked toward Officer Albert. *Id.* at 39. Officer Albert testified that he told Wyda to get back on the stretcher and let the EMTs do their job, and he warned that he would use his taser if Wyda did not cooperate. *Id.* at 39. He testified that after Wyda turned toward one of the paramedics, who was defenseless, he tased Wyda. *Id.* Wyda fell to the ground, but "immediately got up swinging his arms." *Id.* at 40. Officer Albert testified that Wyda "started cursing, 'Why the fuck did you do that?'" and said, "Now you're going to fucking get yours." *Id.* He stated that he and Wyda got into a physical altercation, and Officer Albert grabbed Wyda with his right arm, and then "saw [Wyda's] right fi[]st was coming at [him.] [He] went back to try and avoid it, and as I did so he caught me." *Id.* at 41. Officer Albert fell back and hit the ground, and his neck snapped back. *Id.* Officer Albert felt immediate pain, but crawled over to get on top of Wyda, and then the EMTs were able to assist in containing Wyda. *Id.*

Officer Albert testified that he and the EMTs remained on top of Wyda, but were unable to handcuff him. They waited until back-up officers arrived, who were able to place Wyda into custody. *Id.* at 42-43. Officer Albert testified that the incident, from the time he arrived until they had the physical struggle, lasted about three minutes. *Id.* at 57. He further testified that from his observations, including "enormous strength, babbling, nothing making sense,

screaming, [and] a lot of yelling," it appeared Wyda was under the influence of a mood-altering substance. *Id.* at 58-59.

Officer Albert testified that he had a herniation in two discs, which eventually required surgery. *Id.* at 46-48. He has had pain every day since the incident, *id.* at 45, and, as of the time of trial, had not been able to return to work. *Id.* at 49.

Police Officer Gerald Tallo also testified at the trial. He self-dispatched to the scene when he heard that an officer needed assistance. *Id.* at 61. When he arrived, he saw three to four officers that were struggling with a male, who he later learned was Wyda. *Id.* at 62. He testified they were able to get Officer Albert away from Wyda and he could see Officer Albert was in pain. *Id.* Officer Tallo testified that Wyda continued to struggle, and Officer Tallo tased him, and Wyda continued to struggle after being tased. *Id.* at 63-64. The officers were eventually able to take Wyda into custody. *Id.* at 64. Officer Tallo testified that, based on his observations of Wyda's behavior, Wyda was "under the influence of something." *Id.* at 71.

Officer Steven Levin testified that he also self-dispatched to the scene. *Id.* at 73. He described a similar scene as Officers Albert and Tallo, but also testified that he observed a white substance, either spit or foam, coming from Wyda's mouth, and recalls Wyda saying, "Get the fuck off me." *Id.* at 78. He further testified that after Wyda was in custody, he interviewed witnesses. *Id.* at 76. He learned through the investigation that Wyda had been seen walking down the street, acting erratic. *Id.* at 77. He was banging on cars, flopping

around, and flailing his arms. *Id.* As EMTs treated him, he became disorderly and attacked Officer Albert. *Id.* He testified that the witnesses said Wyda was tased several times, and told several times to calm down and that the officer and EMTs were there to help him. *Id.*

Wyda's mother, Sherry G. Wyda, testified for the defense. She stated that Wyda had not been well and was walking to her house so that she could get him a ride to the hospital. *Id.* at 86.

Wyda testified in his own defense. He testified that he had an abscess tooth, and had been to the hospital twice in the days preceding the incident. *Id.* at 91. He was on antibiotics, was "real tired," and had no appetite. *Id.* at 92. He had swallowed a plastic partial tooth, and was really weak on the day of the incident. *Id.* He told his mother he would come to her house. *Id.* During the walk to his mother's house he had trouble breathing, and thought he was choking. *Id.* He hit into a car because he was scared, as he could not intake air to breath. *Id.* He testified that he remembered "banging [his] body, like slamming [his] chest, [his] head, everything, and screaming, hitting it off the ground," and then he "was out cold." *Id.* That is the last thing he remembers. He does not recall the incident with Officer Albert. *Id.* He testified that "bits and pieces" started to come back, and he remembers "a little bit of a stretcher," but he does not know "what happened between them picking me up or putting me in the car." *Id.* at 95. He testified that the last thing he remembered "was thinking I was dying, screaming, hitting the road, and that was it." *Id.*

Timothy Burke, Wyda's housemate, also testified. He stated Wyda was very sick the week and day of the incident due to an abscess tooth. *Id.* at 102. He was sleeping a lot, and could not eat or drink anything. *Id.* at 103. He testified that Wyda was not using drugs or alcohol on the day in question. *Id.* Wyda left to go to his mother's, so that she could get him a ride to the hospital. *Id.* at 103-04.

The jury and trial court convicted Wyda of the above-referenced offenses.[4] The trial court sentenced Wyda to six to 15 years' incarceration for the aggravated assault conviction (intentionally, knowingly, or recklessly causing serious bodily injury to a police officer). The second aggravated assault conviction and the simple assault, REAP, and resisting arrest convictions merged for sentencing purposes and the court imposed no further penalty for the disorderly conduct and harassment convictions. Wyda filed a timely notice of appeal.

Wyda raises the following issue on appeal:

> 1. Whether there was sufficient evidence presented at trial to enable the fact-finder to find each element necessary for conviction for the charges of aggravated assault under both 18 Pa.C.S.A. § 2702(a)(2) and (a)(3); simple assault, and recklessly endangering another person since the evidence presented at trial was insufficient to establish that [Wyda] had the requisite mental state necessary to be convicted of each crime?

Wyda's Br. at 2.

---

[4] The trial court found Wyda not guilty of public drunkenness and similar misconduct, 18 Pa.C.S.A. § 5505.

Wyda argues that the Commonwealth failed to establish that he acted with the *mens rea* required for each conviction. Wyda notes that the various convictions required proof beyond a reasonable doubt that he acted knowingly, intentionally, or recklessly, depending on the conviction. Wyda contends that the evidence here at most shows he was unaware of his conduct and that he was not "consciously doing anything."

In support, Wyda notes the testimony of the eyewitnesses that he was unconscious when the officers and EMTs arrived, and points out that an EMT testified that he did not believe Wyda knew they were there. He also observes that some of the witnesses testified that when he regained consciousness, he appeared to be unable to comprehend what was going on and not to know that EMTs were present. Wyda argues that the evidence thus established he was "unaware, confused, unconscious and incoherent," Wyda's Br. at 14, and that he had a "blank stare," was unresponsive to questions, was incoherent and mumbling. *Id.* at 16. He also notes testimony that the incident occurred in three to six minutes. *Id.* at 17. He thus argues that there was insufficient evidence that his "mental state changed from unawareness and incomprehension to one of comprehension in seconds." *Id.* at 21.

When reviewing a sufficiency of the evidence claim, we must determine whether, when viewed in the light most favorable to the verdict winner, the evidence at trial and all reasonable inferences therefrom are sufficient for the trier of fact to find each element of the crime beyond a reasonable doubt. *See Commonwealth v. Brown*, 23 A.3d 544, 559 (Pa.Super. 2011) (*en banc*).

"The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence." *Id.* (quoting **Commonwealth v. Hutchinson**, 947 A.2d 800, 805-06 (Pa.Super. 2008)).

Wyda was convicted under two different subsections of the aggravated assault statute. Under one subsection, the Commonwealth had to establish that Wyda "attempt[ed] to cause or intentionally, knowingly or recklessly cause[d] serious bodily injury to" a police officer "while in the performance of duty." Under the other subsection, the Commonwealth was required to prove that Wyda "attempt[ed] to cause or intentionally or knowingly cause[d] bodily injury to" a police officer "in the performance of duty." 18 Pa.C.S.A. § 2702(a)(3).

For the simple assault conviction, the Commonwealth bore the burden of proving that Wyda "attempt[ed] to cause or intentionally, knowingly or recklessly cause[d] bodily injury to another." 18 Pa.C.S.A. § 2701(a)(1). For REAP, the Commonwealth had to establish that Wyda "recklessly engaged in conduct which places or may place another person in danger of death or serious bodily injury." 18 Pa.C.S.A. § 2705.

Thus, to support the aggravated assault conviction for causing serious bodily injury to a police officer and the simple assault, and for the REAP conviction, the Commonwealth had to prove that Wyda acted intentionally, knowingly, or recklessly. For the remaining aggravated assault conviction, the Commonwealth had to prove that Wyda acted intentionally or knowingly.

- 10 -

The Crimes Code defines the mental states at issue as:

(b) Kinds of culpability defined.--

(1) A person acts intentionally with respect to a material element of an offense when:

(i) if the element involves the nature of his conduct or a result thereof, it is his conscious object to engage in conduct of that nature or to cause such a result; and

(ii) if the element involves the attendant circumstances, he is aware of the existence of such circumstances or he believes or hopes that they exist.

(2) A person acts knowingly with respect to a material element of an offense when:

(i) if the element involves the nature of his conduct or the attendant circumstances, he is aware that his conduct is of that nature or that such circumstances exist; and

(ii) if the element involves a result of his conduct, he is aware that it is practically certain that his conduct will cause such a result.

(3) A person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that, considering the nature and intent of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation.

18 Pa.C.S.A. § 302(b)(1)-(3).[5]

---

[5] Wyda further claims that, to support the aggravated assault conviction under a finding that a person acted recklessly, the "recklessness must . . . be such that life threatening injury is essentially certain to occur." ***Commonwealth v. O'Hanlon***, 653 A.2d 616, 618 (Pa. 1995). Therefore, Wyda claims, to

Contrary to Wyda's argument, the evidence supports a finding that Wyda regained consciousness and was aware of his actions. Although he was lying on the ground and had a blank stare when Officer Albert and the EMTs arrived, he woke up as he was being placed on the stretcher, and said "I didn't do anything." Further, after Officer Albert used his taser, Wyda said to him, "Why the fuck did you do that?" The witnesses also testified that Wyda woke up, fixated on Officer Albert, and attacked him. Such evidence supports a finding that Wyda was conscious and aware of his actions and that he intentionally or knowingly caused bodily harm to Officer Albert and intentionally, knowingly, or recklessly caused serious bodily harm to Officer Albert.

Judgment of sentence affirmed.

President Judge Emeritus Ford Elliott joins the Memorandum.

President Judge Emeritus Gantman concurs in the result.

_____

establish an aggravated assault conviction based on reckless conduct, the person must "have a specific state of mind to commit serious bodily injury." Wyda's Br. at 11. In **O'Hanlan**, the court addressed a different section of the aggravated assault statute, a section that required that the defendant act "intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life." **O'Hanlon**, 653 A.2d at 617; 18 Pa.C.S.A. § 2502(a)(1). Here, the subsections at issue do not require that the defendant act "under circumstances manifesting extreme indifference to the value of human life." Rather, one of the subsections at issue, subsection 2702(a)(2), requires that the actions be against a police officer, or other statutorily designated individual. 18 Pa.C.S.A. § 2702(a)(2). The other subsection at issue, subsection 2702(a)(3), does not allow a conviction based on reckless conduct. Rather, under that subsection the Commonwealth must prove the defendant acted intentionally or knowingly. **See** 18 Pa.C.S.A. § 2707(a)(3).

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>12/06/2019</u>